NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2658-12T3

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

REGINALD ANTHONY,

    Defendant-Appellant.

_____

> **APPROVED FOR PUBLICATION**
>
> **January 19, 2016**
>
> **APPELLATE DIVISION**

Argued September 21, 2015 — Decided January 19, 2016

Before Judges Messano, Carroll and Sumners.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 11-04-0702.

Mark H. Friedman, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Mr. Friedman, on the brief).

Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Carolyn A. Murray, Acting Essex County Prosecutor, attorney; Ms. Rosano, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Tried by a jury, defendant Reginald Anthony was convicted of second-degree conspiracy to commit burglary, N.J.S.A. 2C:5-2 and 2C:18-2(b)(1).  The jury acquitted defendant of the

remaining counts of the indictment, including burglary, robbery, murder, felony-murder and related weapons offenses. The judge granted the State's motion to sentence defendant as a persistent offender, N.J.S.A. 2C:44-3(a), and imposed the maximum extended term of twenty years' imprisonment, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

Defendant raises the following issues for our consideration on appeal:

> POINT I
>
> THE TRIAL COURT ERRED PREJUDICIALLY IN RULING THAT UNDER [RULE] 3:17 THE POLICE WERE NOT REQUIRED TO RECORD THE QUESTIONING OF DEFENDANT BETWEEN HIS ARREST AND HIS STATEMENT THAT "PIPE MADE ME DO IT" BECAUSE THEY VIEWED HIM AS A WITNESS RATHER THAN A SUSPECT FOR THE CRIMINAL ACTS COMMITTED AGAINST [THE VICTIM].
>
> POINT II
>
> DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE AND UNDULY PUNITIVE BECAUSE IT IS FOUNDED ON IMPROPER FINDINGS REGARDING AGGRAVATING FACTORS.

We have considered these arguments in light of the record and applicable legal standards. We affirm defendant's conviction and remand the matter for reconsideration of the sentence imposed.

A pre-trial evidentiary hearing was held regarding the admissibility of defendant's statement to investigators.[1] Lieutenant Thomas J. Kelly of the Essex County Prosecutor's Office Homicide Squad testified that on Thursday, April 15, 2010, he responded to a single-family home in Essex Fells to investigate a homicide. The ninety-one-year-old victim was found dead in his home office with his hands and feet bound. The home was in disarray, and the victim's body bore "defensive type wounds" on his forearms as well as a laceration to his neck.

Kelly learned that the victim's wife last had contact with him at approximately 7:00 p.m. the night before. She told detectives that the couple regularly used a car service to drive to New York City where they had an apartment. On April 13, she went to New York alone. The driver was not her usual driver but someone "with the name Reggie." According to Kelly, using several "databases," police were able to identify "Reggie" as

---

[1] Defendant was indicted with Shaun Woodson. Both defendants participated in the pre-trial evidentiary hearing; however, defendant was tried separately.

defendant, and they located his possible residence in East Orange. Defendant was the subject of an open arrest warrant.[2]

Detectives arrived at the East Orange address and took defendant into custody on the active warrant. Kelly advised defendant of his <u>Miranda</u>[3] rights by reading from a card Kelly kept in his wallet. At approximately 8:30 p.m., after being transported to the Prosecutor's Office, defendant agreed to speak with detectives. We quote extensively from Kelly's testimony which sets forth in detail the foreknowledge detectives possessed at this point in the investigation.

> At this point[,] we . . . believed [defendant] possibly was the last person to have contact with our victim. We questioned him about . . . his Aunt . . . Sheila Humphreys . . . who either owns or operates the company that the [victim and his wife] utilize when they travel back and forth from the City. . . . Mrs. Humphreys . . . had asked [defendant] to make the pickup. . . . [T]his wasn't the first time. He had done it one other time he told us in that initial interview.
>
> [Defendant] reported that he went to the location on [April 13], picked up [the victim's wife]. He advised us that [the victim] did not make the trip with her, and . . . he noted that. . . . [H]e drove her into the City.

---

[2] On cross-examination, Kelly confirmed this was a "municipal traffic warrant out of West Orange."

[3] <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 86 <u>S. Ct.</u> 1602, 16 <u>L. Ed.</u> 2d 694 (1966).

[Defendant] explained . . . that the normal procedure . . . is the driver goes to the person's house in their own car, and then you pick up the person's car, make the transport to and from in that vehicle, and return the vehicle to the person's house and then get in your own vehicle and go about your business.

[Defendant] advised us that on [April 13] that's not what he did. He told us that he came back from the City and instead of going back to . . . the [victim's] residence, he took their car for a ride. In the course of doing that, . . . he . . . met up with a friend of his named Pipe. . . . [H]e believed his first name [w]as Shaun and that he was from East Orange . . . .

[Defendant] told us that at some point he received a phone call from his aunt making sure that he was back with the transport . . . . [H]e went back up with the [victim's] car and returned it to [the victim's] home . . . . [P]ipe was with him when he returned the car. . . . [T]hey parked the car the way they're supposed to, and they got back into the car that [defendant] drove to get up there and they left Essex Fells.

Defendant denied ever returning to the Essex Fells house.

At approximately 2:45 a.m., detectives applied for and obtained a communication data warrant (CDW) to "plot out [defendant's] cell phone to see if his movements as . . . described . . . in his interview were accurate." While this occurred, defendant remained in custody in the interrogation room on the active warrant, but was not questioned further.

By 9:00 a.m., records secured through the CDW revealed that defendant's cellphone had "hit off a cell tower" near the victim's home at approximately 8:00 p.m. on April 14. This was contrary to defendant's claim that he had never returned to the victim's home after leaving there the prior evening. Confronted with this information, defendant asked to speak to Kelly alone and told him, "Pipe made me take him back up there."

At this point, Kelly had another detective "start the video camera so we could start recording anything that was said . . . from that point forward." Kelly re-administered Miranda warnings to defendant, who executed a waiver of rights form and agreed to provide a statement to detectives, but that process was not recorded. The video recording, approximately thirty-eight minutes in length, was played for the judge.[4]

Kelly denied that defendant suffered any injuries while in custody, or that defendant ever asked to speak to an attorney. On cross-examination, Kelly acknowledged the "Attorney General Guidelines" regarding the recordation of statements, but asserted that "[t]he [G]uidelines don't require that the Miranda itself [be] recorded." Kelly stated that defendant first became a suspect in the homicide "when I knew his cell phone was up in th[e] area" of the victim's home.

---

[4] The video is not part of the appellate record.

Detective Philip Gregory testified as a defense witness. He accompanied Kelly during defendant's arrest, corroborated that Miranda rights were read to defendant in the police vehicle, and started the video recording machine outside of the interview room. Gregory believed that the re-administration of Miranda rights to defendant was recorded. Gregory also denied that any officer used physical force against defendant, or that defendant was injured in any way during the time he was in custody.

Defendant's girlfriend testified that, when defendant drove her to work during the afternoon hours on the date of his arrest, he bore no signs of physical injury. Defendant testified that he was treated harshly when arrested, and detectives neither read him his Miranda rights nor told him why he was arrested. Defendant claimed that in the interrogation room, detectives made him "feel" like he was in custody for the homicide and denied defendant's request for an attorney. Defendant testified that Gregory and other officers physically assaulted him. He acknowledged initialing the Miranda waiver form for Kelly, but he only did so after first refusing because he feared additional physical abuse. Defendant further testified that Kelly told him what to say prior to recording the statement. Defendant was in pain upon his arrival at the county

jail, and sheriff's officers transported him to the hospital where he was diagnosed with contusions and a "ruptured eardrum."[5]

On cross-examination, defendant admitted familiarity with the Miranda warnings, as evidenced by three waiver forms defendant admittedly executed following prior arrests, and also acknowledged his prior criminal convictions. Although initially claiming that he had never given a statement to police in the past, the prosecutor confronted defendant with a signed statement from one of his prior arrests. Defendant had forgotten because it occurred long ago.

After argument by the attorneys, the judge orally explained his decision to admit defendant's statement into evidence. In a written opinion that followed, the judge specifically credited Kelly's testimony and discredited defendant's. The judge made various observations from the video recording that belied defendant's assertions of maltreatment and physical abuse, and noted that medical notes did not support a conclusion that

---

[5] In argument that followed the testimony, defense counsel referenced some nurse's notes from the hospital, which he claimed were "stipulated to by the State." There was no reference to them during the testimony, but the notes apparently contained observations of "fresh blood in [defendant's] ear canal caused by a ruptured eardrum, a contusion on his forehead, [and] a swelling of his right jaw." At trial, the nurse practitioner who treated defendant at the hospital testified to his injuries.

defendant's ear had been injured seven hours earlier, as defendant claimed.

Addressing the salient issue on appeal, the judge wrote:

> [D]efendant was . . . read his <u>Miranda</u> warnings at the time he was taken into custody. Further, while defendant argues that the <u>Miranda</u> waiver should have been electronically recorded pursuant to [<u>Rule</u>] 3:17(a), the rule requires only that "custodial interrogations conducted in a place of detention must be electronically recorded when the person being interrogated is charged." Moreover, "the failure to electronically record a defendant's custodial interrogation . . . shall be a factor for consideration by the trial court in determining the admissibility of a statement." <u>R.</u> 3:17(d). Here, <u>as both officers testified</u>, defendant was a witness because he was possibly the last person to see [the] victim alive and did not become a suspect until he indicated he wanted to talk, when he was again issued the <u>Miranda</u> warnings and given a waiver form to sign before providing an electronically recorded statement.
>
> [(Emphasis added).]

The judge concluded that the "custodial interrogation was properly conducted[,] . . . the requisite warnings [were] given[,] . . . [and] the State ha[d] proven beyond a reasonable doubt that . . . defendant knowingly and intelligently waived each and every one of those rights . . . and that . . . defendant neither invoked nor attempted to invoke any of those rights thereafter."

The State introduced defendant's statement at trial. It suffices to say that defendant claimed Woodson demanded that they return to the victim's home on the night of April 14, and told defendant he wanted to "rob[]" the place. Defendant reluctantly drove there and waited in the car as Woodson entered through the front door of the home. Defendant never knew the victim had been murdered until his aunt told him.

Defendant testified before the jury and gave a similar account of events, admitting that he agreed to drive Woodson to the home with the intention that Woodson enter to burglarize the house if no one was at home. He also testified regarding the physical abuse he sustained during interrogation by police. As noted, the jury convicted defendant of conspiracy to commit burglary but acquitted him of all other charges.

## II.

Before us, defendant contends that the judge erred by concluding the interrogation did not need to be recorded pursuant to Rule 3:17 (the Rule) until defendant uttered the phrase, "Pipe made me take him back up there." Defendant contends that the judge erred as a matter of law by concluding the officers' subjective belief controlled, and he argues we should review de novo the judge's conclusion that defendant was not a suspect until that point. He urges "an objective

standard" should apply, i.e., application of the Rule should turn on whether a defendant is a "suspect" based upon "objective rather than subjective circumstances." Defendant argues that, although the Rule does not mandate suppression of his statement if violated, the error nevertheless requires reversal in this case.

The State argues that the detectives were not required to record their initial interview with defendant because he was not arrested for any of the crimes listed in the Rule which trigger law enforcement's obligation to record the interrogation. Alternatively, the State argues that objectively looking at the facts known to Kelly, defendant was not a suspect in the murder until Kelly confronted him with the CDW information, and defendant blurted out, "Pipe made me take him back up there." From that point, the State argues investigators complied with the Rule. Lastly, the State contends that any error was harmless, because the jury obviously believed defendant's version of events and acquitted him of all but the conspiracy count at trial.

The Rule is relatively new, having been adopted by the Court in 2005, following its decision in State v. Cook, 179 N.J. 533 (2004), the formation of a special committee, id. at 562, and receipt of the committee's report. No reported decision has

fully construed the Rule's somewhat ambiguous provisions.[6]  We

begin by clarifying our standard of review.

A.

As the Court most recently said, "[a]ppellate courts

reviewing a grant or denial of a motion to suppress must defer

to the factual findings of the trial court so long as those

findings are supported by sufficient evidence in the record."

Hubbard, supra, 222 N.J. at 262.  "We defer to those findings of

fact because they 'are substantially influenced by [an]

opportunity to hear and see the witnesses and to have the "feel"

of the case, which a reviewing court cannot enjoy.'"  Ibid.

(quoting State v. Johnson, 42 N.J. 146, 161 (1964)).  We do not,

however, defer to the trial court's legal conclusions, which we

_____

[6] In State v. Hubbard, 222 N.J. 249 (2015), the Court referred to
the Rule by stating,

> [T]he Court adopted Rule 3:17 in 2005, which
> generally requires electronic recordation of
> custodial interrogations of those charged
> with certain enumerated serious offenses.
> Rule 3:17(a) outlines a series of
> circumstances in which the electronic
> recordation requirement applies when the
> person being interrogated is charged with
> murder, aggravated manslaughter, or
> manslaughter.
>
> [Id. at 263.]

We believe this passing reference was dicta, since the Rule
itself had little to do with the issue confronting the Court in
Hubbard.

12

review de novo. Id. at 263. "And for mixed questions of law and fact, we give deference . . . to the supported factual findings of the trial court, but review de novo the lower court's application of any legal rules to such factual findings." State v. Harris, 181 N.J. 391, 416 (2004).

Because interpretation of a court rule is a legal issue, our review is de novo. State v. Tate, 220 N.J. 393, 405 (2015). "The approach taken in respect of the construction of court rules is the same as that for the construction of statutes." State v. Clark, 191 N.J. 503, 508 (2007) (citing Wiese v. Dedhia, 188 N.J. 587, 592 (2006)). "[W]e typically begin by examining the plain language of a court rule, and give the words their ordinary meaning." Ibid. (citing Wiese, supra, 188 N.J. at 592). "We turn to extrinsic materials when the language of the rule is ambiguous and lends itself to more than one plausible interpretation." Id. at 508-09 (citing Wiese, supra, 188 N.J. at 592).

B.

In Cook, supra, 179 N.J. at 542-46, the defendant was arrested on outstanding municipal warrants and interrogated on four separate occasions over two days; the sessions were not electronically recorded. The Court rejected defendant's claim that his due process rights were violated by the State's failure

to record the interrogations, but it concluded "[t]he proverbial 'time has arrived' . . . to evaluate fully the protections that electronic recordation affords to both the State and to criminal defendants." Id. at 562. The Court "establish[ed] a committee to study and make recommendations on the use of electronic recordation of custodial interrogations." Ibid.

The Supreme Court Special Committee on Recordation of Custodial Interrogations (the Committee) issued its report on April 15, 2005. The report included a comprehensive analysis of the different recordation requirements adopted throughout the United States, as well as statutes and case law from sister states where policies had already been enacted. Report of the Special Committee on Recordation of Custodial Interrogations, at 6 (Apr. 15, 2005) (the Committee Report). The Committee made a series of recommendations including:

> RECOMMENDATION 3: Electronic recording should occur when a custodial interrogation is being conducted in a place of detention and should begin at, and include, the point at which Miranda warnings are required to be given.
>
>  . . . .
>
> RECOMMENDATION 4: Electronic recording of custodial interrogations occurring in a place of detention should occur when the adult or juvenile being interrogated is charged with an offense requiring the use of a warrant pursuant to [Rule] 3:3-1c.

. . . .

RECOMMENDATION 5. The requirement for electronic recordation of custodial interrogations occurring in a place of detention should not apply in circumstances where:

. . . .

(f) a statement is given at a time when the accused is not a suspect for the crime to which that statement relates while the accused is being interrogated for a different crime that does not require recordation[] . . . .

[Committee Report at 37-40.]

The rule proposed by the Committee included recommendation four and five but did not explicitly include the requirement in recommendation three, i.e., that recordation "begin at, and include, the point at which Miranda warnings are required to be given." Id. at 44-46.

On October 14, 2005, the Court ordered implementation of the Rule, effective January 1, 2006, in respect of all homicide offenses and January 1, 2007, for all other offenses specified in paragraph (a) of the Rule. The Rule as adopted mirrored the Committee's proposed rule and provides in relevant part:

a) Unless one of the exceptions set forth in paragraph (b) are present, all custodial interrogations conducted in a place of detention must be electronically recorded when the person being interrogated is charged with murder, . . . aggravated manslaughter, manslaughter, robbery, . . .

> burglary, . . . any crime involving the possession or use of a firearm, or conspiracies or attempts to commit such crimes.
>
> . . . .
>
> (b) Electronic recordation pursuant to paragraph (a) must occur unless:
>
> . . . .
>
> (vi) a statement is given at a time when the accused is not a suspect for the crime to which that statement relates while the accused is being interrogated for a different crime that does not require recordation,
>
> . . . .
>
> The State shall bear the burden of proving, by a preponderance of the evidence, that one of the exceptions is applicable.
>
> [R. 3:17 (emphasis added).]

The failure to record the interrogation does not require suppression of a defendant's statement, but it "shall be a factor for consideration by the trial court in determining the admissibility of a statement, and by the jury in determining whether the statement was made, and if so, what weight, if any, to give to the statement." R. 3:17(d). Further, in the absence of recordation, the court "shall, upon request of the defendant, provide the jury with a cautionary instruction." R. 3:17(e); see Model Jury Charge (Criminal), "Statements of Defendant (When

Court finds Police Inexcusably Failed to Electronically Record Statement)," (Approved 11/7/05).

With this background in mind, we return to the arguments advanced on appeal.

C.

The State contends that the detectives were under no obligation to record their initial interview with defendant because he was in custody on municipal warrants and had not been "charged with" the homicide or any other crime listed in subsection (a) of the Rule. Defendant counters by arguing such an interpretation would permit police to question suspects in homicides without recording the interrogation, thereby defeating the prophylactic purposes of the Rule. Defendant also argues that the State's interpretation is inconsistent with the exception provided by subsection (b)(vi). We agree with defendant.

Although subsection (a) is triggered when the person in custody is "being interrogated" and "charged with" one of the listed offenses, subsection (b)(vi) excepts from the Rule's requirements the need to record a statement if "the accused is not a suspect for the crime to which that statement relates while the accused is being interrogated for a different crime that does not require recordation." R. 3:17 (emphasis added).

The State concedes the ambiguity of the operative terms used in the Rule, i.e., "charged with" versus "not a suspect." Under the State's rationale, the Rule does not require recordation of a statement made by a defendant who is not charged with a listed crime, even if he is a suspect.

The construction urged by the State would render exception (b)(vi) superfluous, a circumstance we seek to avoid in interpreting a statute or court rule. See, e.g., In re N.B., 222 N.J. 87, 101 (2015) ("Such an interpretation would contravene the canon of statutory construction that directs courts to interpret laws so as to give meaning to all of the . . . text."). Instead, "[t]he Court must 'seek an interpretation that will make the most consistent whole of the statute.'" Ibid. (quoting State v. Sutton, 132 N.J. 471, 479 (1993)).

A more consistent interpretation, and one that supports the policy of the Rule, is that urged by defendant. Law enforcement officials must record custodial interrogations of those who are suspected of committing, and will be questioned about, any crime listed in subsection (a) of the Rule. This interpretation is supported by other provisions in the Rule. For example, subsection (b)(iv) excepts from the recordation requirements statements made "by a suspect who indicated, prior to making the

18                                                                    A-2658-12T3

statement, that he/she would participate in the interrogation only if it were not recorded; provided however, that the agreement to participate under that condition is itself recorded." R. 3:17 (b)(iv) (emphasis added).

This interpretation finds support in the Committee Report, which examined existing laws and case law in Alaska, Minnesota, Illinois, Maine, Massachusetts and the District of Columbia. In each instance, the Committee noted the procedures enacted or contemplated in those states expressly applied to "suspects" or to the "accused" at trial. Committee Report, supra, at 6-12.

The State argues that the Court's adoption of the "charged with" language in subsection (a) was a conscious decision to depart not only from the direction charted by other states, but also from the path plotted by, and being voluntarily implemented by, New Jersey's law enforcement community when the Rule was adopted. The State cites to the Committee's review of the Interim Policy Statement of the New Jersey Attorney General and the New Jersey County Prosecutors' Association (Apr. 13, 2004), and the Amended Policy Statement (Dec. 17, 2004), which provided for electronic recording of "a person who is suspected of committing" certain crimes. The State contends the Court intended to limit the Rule's application to only those instances

where the person "being interrogated" was already "charged with" certain crimes. We disagree.

First and foremost, the defendant in <u>Cook</u>, the decision which spawned enactment of the <u>Rule</u>, was not "charged with" the homicide or any other enumerated offense when questioned by police, although he was surely a suspect at the time. <u>Cook</u>, <u>supra</u>, 179 <u>N.J.</u> at 541-43. Like defendant in this case, he was arrested on municipal court warrants. <u>Ibid.</u> The Court's charge to the Committee was "to study and make recommendations on the use of electronic recordation of custodial interrogations[,]" without limiting consideration to interrogations of only those "charged with" certain offenses. <u>Id.</u> at 562.

Additionally, although not precisely on point with the issue here, the Court has considered whether a defendant's statement should be suppressed in a variety of circumstances where the defendant was not fully appraised of his status as a suspect prior to receiving or waiving his <u>Miranda</u> rights. For example, in <u>State v. A.G.D.</u>, 178 <u>N.J.</u> 56, 68 (2003), the Court held that a suspect was deprived of "information indispensable to a knowing and intelligent waiver of [<u>Miranda</u>] rights" when the detectives interrogating him failed to advise that they already possessed a warrant for his arrest. The Court concluded that "[w]ithout advising the suspect of his true status when he

20

does not otherwise know it, the State cannot sustain its burden . . . that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." Ibid.

In State v. O'Neill, 193 N.J. 148, 180 (2007), the Court concluded that "[t]he two-step, 'question-first, warn-later' interrogation is a technique devised to undermine both the efficacy of Miranda and our state law privilege." The Court held that "as a matter of state law, . . . when Miranda warnings are given after a custodial interrogation has already produced incriminating statements, the admissibility of post-warning statements will turn on whether the warnings functioned effectively in providing the defendant the ability to exercise his state law privilege against self-incrimination." Id. at 180-81.

In State v. Nyhammer, 197 N.J. 383, 406 (2009), cert. denied, 558 U.S. 831, 130 S. Ct. 65, 175 L. Ed. 2d 48 (2009), the Court made clear that failing to inform a person of his "suspect status" does not necessarily vitiate the voluntary waiver of his Miranda rights "or . . . require[] automatic suppression of a statement." "[T]he failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances." Id. at 407.

Even though suppression of a defendant's statement is not a *fait* *accompli* if the <u>Rule</u> is violated, the cited cases reflect the Court's concern that a defendant's status as a suspect be part of the calculus in determining the voluntary nature of any waiver of the right to remain silent. Additionally, the Court in <u>Cook</u> cited its historical concern "for the reliability and trustworthiness of confessions as a prerequisite for their use." <u>Cook</u>, <u>supra</u>, 179 <u>N.J.</u> at 560; <u>see also</u> <u>N.J.R.E.</u> 104(c) (requiring the judge to preliminarily determine the admissibility of any statement by a defendant).

The critical role of the jury in evaluating the truthfulness of a defendant's statement has been long-recognized by our courts. <u>See</u> <u>State v. Hampton</u>, 61 <u>N.J.</u> 250, 272 (1972) (jury must "decide whether in view of all the . . . circumstances the defendant's confession is true"); <u>State v. Kociolek</u>, 23 <u>N.J.</u> 400, 421-22 (1957) (requiring jury to be charged on factors affecting accuracy of extra-judicial oral statements); <u>see also</u> <u>Model Jury Charge (Criminal)</u>, "Statements of Defendant," (revised June 14, 2010). The model jury charge approved to implement the <u>Rule</u> further convinces us that defendant's interpretation is correct. The charge provides in pertinent part:

> Our Rules require the electronic recording of interrogations by law enforcement

officers when a defendant is charged with [insert applicable offenses] <u>so as to ensure that you will have before you a complete picture of all circumstances under which an alleged statement of a defendant was given</u>, so that you may determine whether a statement was in fact made and, if so, whether it was accurately reported by State's witnesses and whether it was made voluntarily or is otherwise reliable or trustworthy. <u>Where there is a failure to electronically record an interrogation, you have not been provided with a complete picture of all of the facts surrounding the defendant's alleged statement and the precise details of that statement</u>. By way of example, you cannot hear the tone or inflection of the defendant's or interrogator's voices, or hear firsthand the interrogation, both questions and responses, in its entirety. Instead you have been presented with a summary based upon the recollections of law enforcement personnel. Therefore, you should weigh the evidence of the defendant's alleged statement with great caution and care as you determine whether or not the statement was in fact made and if so, whether what was said was accurately reported by State's witnesses, and what weight, if any, it should be given in your deliberations. The absence of an electronic recording permits but does not compel you to conclude that the State has failed to prove that a statement was in fact given and if so, was accurately reported by State's witnesses.

[<u>Model Jury Charge (Criminal)</u>, <u>supra</u> (emphasis added).]

If we accepted the State's rationale — only interrogations of those "charged with" enumerated crimes need be recorded — portions of a defendant's statement, unrecorded through

conscious decision of his interrogators, would be unavailable to the jury, depriving it of "a complete picture of all of the facts surrounding the defendant's alleged statement and the precise details of that statement." Ibid.

In sum, we conclude that 1) the Rule requires electronic recordation of "all custodial interrogations" if the person is suspected of having committed one of the enumerated crimes contained in subsection (a) and is ultimately charged with one of those crimes; and 2) law enforcement authorities need not record the interrogation if at the time "the accused is not a suspect for the crime to which that statement relates." R. 3:17(b)(vi).

D.

We must still address how the trial judge should consider whether a defendant was "a suspect for the crime to which th[e] statement relates," so as to trigger the recordation requirement. We agree with defendant that the judge cannot simply accept the interrogators' subjective belief that defendant was not a suspect. See, e.g., State v. O'Neal, 190 N.J. 601, 615-16 (2007) ("The determination whether a suspect is in 'custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned'")

(quoting Stansbury v. California, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529, 128 L. Ed. 2d 293, 298 (1994)); State v. Pineiro, 181 N.J. 13, 27 (2004) (an investigative detention and any seizure that results "cannot . . . be justified merely by a police officer's subjective hunch") (quoting State v. Davis, 104 N.J. 490, 505 (1986)).

Defendant posits that the standard should be whether a reasonable person in defendant's situation believed he was a suspect. We reject the contention, if for no other reason than "that the Miranda warnings themselves strongly suggest, if not scream out, that a person is a suspect." Nyhammer, supra, 197 N.J. at 407. Certainly, any person being interrogated who actually committed the crime would reasonably conclude he was a suspect, regardless of what law enforcement actually knew at the time.

Instead, we believe the judge must apply an objective standard that takes into account the totality of the circumstances then known to the interrogator, and decide whether a reasonable police officer in those circumstances had a reasonable basis to believe a defendant was a "suspect" in the crime about which he was being questioned. That standard mirrors the one we apply in many other police-citizen encounters. See, e.g., State v. Mann, 203 N.J. 328, 338 (2010)

("[A] reviewing court must assess whether 'the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate.'") (quoting <u>Piniero</u>, <u>supra</u>, 181 <u>N.J.</u> at 21); <u>O'Neal</u>, <u>supra</u>, 190 <u>N.J.</u> at 615-16; <u>State v. Moore</u>, 181 <u>N.J.</u> 40, 46 (2004) (noting that probable cause to arrest or search "exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient . . . to warrant a [person] of reasonable caution in the belief that an offense has been or is being committed") (quoting <u>Schneider v. Simonini</u>, 163 <u>N.J.</u> 336, 361 (2000)). Under this standard, the State must prove by a preponderance of the evidence that the defendant was not a suspect for the crime to which the statement relates at the time of the interrogation. <u>R.</u> 3:17(b).

We recognize that this standard does not draw a "bright-line" demarking interrogations that must be recorded versus those that need not, and that the judgment officers exercise in the moment may subsequently be questioned and scrutinized well after the fact. Of course, an easy answer to that problem is that all custodial interrogations conducted during investigations of crimes listed in the <u>Rule</u> should be recorded, and, indeed, at least one of our sister states has adopted that

practice. See Committee Report, supra, at 7 (describing practice in Alaska). Moreover, as already noted, practices in those states examined by the Committee explicitly required law enforcement officers to record interrogations of "suspects," not just defendants charged with predicate crimes.

E.

In this case, although the judge did not expressly apply the objective standard we have now defined, we conclude that he did so implicitly. Defendant seizes on a snippet of the judge's written opinion in which he wrote, "both officers testified, defendant was a witness" when interrogated, and argues the judge applied a purely subjective test. We disagree.

Kelly explained that they knew defendant had been to the victim's house two evenings before his body was found, surmising defendant might have been the last person to have seen the victim alive, other than the victim's wife, who had, additionally, spoken to the victim the night before the body was found. The judge found that testimony to be believable, and, the testimony did not demonstrate that Kelly possessed other information pointing to defendant as a suspect. Kelly explained that only after the CDW reports indicated defendant had lied did defendant become a suspect. The judge credited this testimony, too, and concluded that defendant only became a suspect when "he

A-2658-12T3

indicated he wanted to talk" to Kelly. Notably, Kelly started the recording immediately thereafter.[7]

It is easy in hindsight to say that defendant was an obvious suspect in the murder. But, the record reveals that, at the time defendant was arrested on municipal warrants, police only knew that he drove the victim's wife from her house to New York, and returned the family's car, two nights before the victim's body was found. Under these circumstances, the interrogators' belief that defendant was not a suspect in the murder was reasonable, and therefore there was no violation of the Rule.

Having reached that conclusion, we leave for another day consideration of what would be the appropriate remedy if the Rule was violated, and the judge failed to properly find a violation or charge the jury appropriately.

### III.

At sentencing, the judge stated that he did "not intend to consider any other charge . . . than the charge that [defendant]

---

[7] We express some concern that Kelly testified he "confronted" defendant with the information from the CDW before defendant asked to speak to him alone. Defendant was clearly a suspect when Kelly realized he had lied about never returning to the Essex Fells house. However, it appears from the testimony that this was a fluid series of events that occurred in rapid succession and that the recording began immediately after defendant made his remark about Woodson.

was found guilty of . . . ." Citing defendant's extensive criminal history that included four prior indictable convictions, the judge found defendant was a "persistent offender." Focusing on the "violence . . . perpetrated," the judge found aggravating factor one. N.J.S.A. 2C:44-1(a)(1) ("the nature and circumstances of the offense").[8] He also found aggravating factor two, stating that defendant "knew or should have known that the victim of the offense was particularly vulnerable." See N.J.S.A. 2C:44-1(a)(2) ("[t]he gravity and seriousness of harm inflicted on the victim, including whether or not the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age"). Citing defendant's recidivism, the judge found aggravating factors three, six and nine. N.J.S.A. 2C:44-1(a)(3) (the risk of re-offense); (a)(6) (extent and seriousness of prior record); (a)(9) (the need to deter defendant and others). Again citing the victim's age, the judge found aggravating factor twelve. N.J.S.A. 2C:44-1(a)(12) (offense committed against a person

---

[8] We note that the judgment of conviction does not include a finding as to aggravating factor one. However, the judge's oral opinion controls. See State v. Warmbrun, 277 N.J. Super. 51, 58 n.2 (App. Div. 1994), certif. denied, 140 N.J. 277 (1995).

sixty years of age or older).  The judge found no mitigating factors and imposed the sentence referenced above.

Defendant argues the judge mistakenly found aggravating factors one and two by relying "heavily on the facts of the very offenses that defendant was acquitted on."  We agree.

We begin by noting that "[a]ppellate review of the length of a sentence is limited."  State v. Miller, 205 N.J. 109, 127 (2011).  As the Court has recently reiterated:

> The appellate court must affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

"When applying [factor one], 'the sentencing court reviews the severity of the defendant's crime, the single most important factor in the sentencing process, assessing the degree to which defendant's conduct has threatened the safety of its direct victims and the public.'"  Id. at 74. (quoting State v. Lawless, 214 N.J. 594, 609 (2013)).  "[A] sentencing court may justify the application of aggravating factor one . . . by reference to the extraordinary brutality involved in an offense . . . .  A

A-2658-12T3

sentencing court may consider 'aggravating facts showing that [a] defendant's behavior extended to the extreme reaches of the prohibited behavior.'"  Id. at 75 (alteration in original) (citations omitted) (quoting State v. Henry, 418 N.J. Super. 481, 493 (Law. Div. 2010)).

"[Aggravating factor two] compels 'a pragmatic assessment of the totality of harm inflicted by the offender on the victim.'"  Lawless, supra, 214 N.J. at 610 (quoting State v. Kromphold, 162 N.J. 345, 358 (2000)).  "It focuses on the setting of the offense itself with particular attention to any factors that rendered the victim vulnerable or incapable of resistance at the time of the crime."  Id. at 611 (citing N.J.S.A. 2C:44-1(a)(2)).

Defendant was acquitted of all substantive offenses.  The jury only found defendant responsible for the criminal agreement to commit the burglary, rejecting the claim, despite being appropriately charged, that defendant was legally responsible for Woodson's conduct either as an accomplice or co-conspirator. See  N.J.S.A.  2C:2-6(b)(3) and (4) (making one "legally accountable for the conduct of another" if an accomplice of the other person or "engaged in a conspiracy" with the other person).

As a general proposition, "[a]lthough a defendant may be vicariously accountable for the crimes his accomplice commits, he is not vicariously accountable for aggravating factors that are not personal to him." State v. Rogers, 236 N.J. Super. 378, 387 (App. Div. 1989), aff'd, 124 N.J. 113 (1991). In this case, defendant was not found vicariously culpable for the crimes of his co-defendant. Respecting that verdict as we must, the judge erred in attributing the violent, heinous acts of defendant's co-defendant to defendant, and, while there is certainly support in the record for the judge's conclusion that defendant knew the victim was very old, the jury concluded he did not know that Woodson would do personal violence to the victim.

We conclude it was error to find aggravating factors one and two on this record. We remand the matter to the trial court to re-sentence defendant without consideration of those two factors. We do not express any opinion as to the appropriate sentence.

Affirmed in part; reversed in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2658-12T3