**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1018-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

THADDEUS T. REEVEY,

     Defendant-Appellant.

_____

Argued March 5, 2019 – Decided March 25, 2019

Before Judges Fisher, Hoffman and Geiger.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 12-09-1583.

James K. Smith, Jr., Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; James K. Smith, Jr., of counsel and on the brief).

Maura K. Tully, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Monica do Outeiro, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

At the conclusion of a trial in February and March 2016, a jury found defendant guilty of first-degree murder, N.J.S.A. 2C:11-3(a)(1), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). At sentencing, the trial judge imposed a forty-five-year NERA[1] prison term on the murder conviction, and a concurrent six-year prison term, with a forty-two-month period of parole ineligibility, on the weapon conviction. In appealing, defendant argues the trial judge erred: (1) by allowing a prosecution witness to narrate a surveillance video; and (2) by failing to instruct the jury that it could draw a negative inference because police did not record earlier statements made by a witness. Finding no merit in these arguments, we affirm.

The jury heard evidence that, on November 8, 2011, Aaron Bray was living in an apartment in Asbury Park Village with his grandmother. After coming home from work, he received a phone call from Eric Freeman, a childhood friend. Eric later arrived at Aaron's apartment, and they both stood outside and talked.

Aaron's grandmother, who also lived in the apartment, eventually came outside and told Aaron to go vote, as it was Election Day. Aaron entered the

---

[1] No Early Release Act. N.J.S.A. 2C:43-7.2.

A-1018-16T1

apartment to retrieve a sweatshirt. When he returned, Aaron told his grandmother to leave without him. Aaron and Eric walked toward the polling place, and Aaron's grandmother got into her car, along with Aaron's aunt. It was about 6:15 p.m., and the neighborhood was quiet.

When Aaron and Eric reached the corner, they heard noise from the other side of the street. As they turned and began to walk back toward Aaron's apartment, Aaron looked back over his shoulder and saw two men. One was about six feet tall, heavyset, and wearing a black jacket. He was African-American, and had long braids tied up in a bun and facial hair. The other was wearing a gray hooded sweatshirt. Aaron and Eric continued walking, remaining close to each other.

The man in the black jacket turned to his companion, who whispered something as they continued to walk toward Aaron and Eric. The black-jacketed man then pulled out a gun, pointed it at Eric and fired from approximately four feet away. With that, everyone ran. Eric ran to his cousin's residence; Aaron, seeing his grandmother's car, ran to it and got in the back.

When he got in, Aaron was crying. Aaron's grandmother continued driving, proceeding to the polling place. She and his aunt left him there, and Aaron's aunt called 9-1-1.

A-1018-16T1

Police soon arrived to the scene and heard a male voice say, "Are you shot?" Following the direction of that voice, officers saw an open door and, on approaching, saw Eric lying face-first on the apartment's bottom steps. They also observed blood drops on the sidewalk leading to where Eric was lying and where two men were trying to help Eric. The officers noticed Eric had gone limp, and had blood and mucus dripping from his mouth. They checked but found no pulse.

Paramedics arrived before long. They removed Eric's sweatshirt and t-shirt, revealing to the officers what appeared to be a small bullet hole entry on the right side of Eric's chest, and two other bullet hole entries near his neck. An ambulance took Eric to a nearby hospital where he was pronounced dead.

At the scene, officers found three shell casings. They also recovered surveillance footage of the area. No weapon was found.

The officers watched the video at the apartment complex's "control center." Although the footage did not capture the shooting itself, it captured Eric and Aaron walking, followed by two other individuals, one of whom was wearing a black jacket and the other a gray hooded sweatshirt. From one angle, the footage showed that the latter stopped and stayed in view while the black-jacketed man proceeded in Eric and Aaron's direction. While the black-jacketed

4

man was out of view, the other could be seen turning around quickly and running in the opposite direction of where Eric and Aaron were. Although he never reenters the frame, the black-jacketed man's shadow can be seen turning and running in the same direction as his companion in gray. From another angle, Aaron's grandmother's vehicle is seen stopping and letting Aaron into the back seat.

After watching this footage, officers attempted to locate Aaron and learned he went to his girlfriend's house in Farmingdale. They found him there; he was "distraught." They spoke briefly and Aaron agreed to accompany them to the station.

At the station, officers questioned Aaron but found the going "very tough" because Aaron was crying profusely and it was difficult to understand what he was saying. Nonetheless, officers were able to get some information from Aaron regarding the suspect, and they were able to confirm Aaron's willingness to cooperate. But, because of Aaron's state of mind, the officers did not then take a formal statement from him.

The next day, officers contacted Aaron again and brought him back to the station. Aaron was "still obviously distraught," but he appeared to be thinking

5

more clearly and was able to speak. Officers interviewed him and took a formal statement.

In his recorded statement, Aaron claimed he would be able to identify the shooter, and officers showed him a series of six photographs of potential suspects. Of the six, Aaron selected photograph number three – defendant – as the shooter.

Based on this and other evidence, defendant was convicted of first-degree murder and unlawful possession of a weapon. In appealing, defendant argues he was denied a fair trial because:

> I. [A DETECTIVE] WAS ALLOWED TO NARRATE A SURVEILLANCE VIDEO WHICH HAD NEVER BEEN PROPERLY AUTHENTICATED, AND ABOUT WHICH HE HAD NO PERSONAL KNOWLEDGE (Not Raised Below).
>
> II. THE TRIAL COURT FAIL[ED] TO INSTRUCT THE JURORS THAT THEY COULD DRAW A NEGATIVE INFERENCE FROM THE POLICE OFFICERS' FAILURE TO RECORD THE FIRST THREE ORAL STATEMENTS OF AARON BRAY, THE STATE'S MAIN WITNESS (Not Raised Below).

We find no merit in these arguments.

I

In his first point, defendant argues the trial judge erred in permitting Detective Michael Magliozzo to narrate the surveillance footage for the jury.

A-1018-16T1

He argues this was improper because the footage was not authenticated and because the detective had no personal knowledge of the events depicted.

At trial, prior to playing the video, the State elicited testimony from Detective Magliozzo that hours after the incident, he became aware there was surveillance footage of the scene. He viewed the footage that was downloaded from the surveillance cameras at the apartment complex's "control center," which the detective described as a "big closet" in the back of the laundry room area "where they keep the monitoring system, the hard drive and the computer screens."

At trial, the detective testified that the video accurately captured the area and he was able to identify the location of the video cameras by referencing photographs shown to him during his testimony. Without objection, the prosecution played the video for the jury. As it played, the detective described – without objection – what appeared onscreen.

A videotape "qualifies as a writing[]" under N.J.R.E. 801(e) and must be "properly authenticated" before being admitted. See State v. Wilson, 135 N.J. 4, 17 (1994). Under N.J.R.E. 901, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter is what its proponent claims." The

authentication rule "does not require absolute certainty or conclusive proof." State v. Mays, 321 N.J. Super. 619, 628 (App. Div. 1999). "The proponent of the evidence is only required to make a prima facie showing of authenticity." Ibid. (citations omitted). "Once a prima facie showing is made, the [item] is admissible, and the ultimate question of authenticity of the evidence is left to the jury." Ibid. (citations omitted).

Authentication of a videotape is similar to authentication of a photograph. State v. Loftin, 287 N.J. Super. 76, 98 (App. Div. 1996). "[T]estimony must establish that the videotape is an accurate reproduction of that which it purports to represent and the reproduction is of the scene [when] the incident took place." Ibid. (citing Wilson, 135 N.J. at 15). The photographer or videographer need not testify "because the ultimate object of an authentication is to establish its accuracy or correctness." Wilson, 135 N.J. at 14. Thus, "any person with the requisite knowledge of the facts represented in the photograph or videotape may authenticate it." Ibid.

Because defendant did not object, we review his argument under the plain-error standard. R. 2:10-2; see also State v. Singleton, 211 N.J. 157, 182 (2012). To warrant reversal, the error must be "clearly capable of producing an unjust

A-1018-16T1

result." R. 2:10-2.  In applying this standard, we find no reversible error.  In fact, we find no error at all.

The detective sufficiently authenticated the video during his testimony:

> Q:  Now, based upon your viewing it that night and viewing it after the fact, did it adequately or did it reflect what that, those areas looked like on that night?
>
> A:  Yes.
>
> Q:  Does it adequately, you know, to some extent show the lighting conditions and things like that?
>
> A:  Yes.

Defendant claims the detective's testimony was insufficient because he did not personally observe what was captured.  That argument has no merit.  It was unnecessary for the detective to be present at the scene at the time of the shooting for him to confirm what was depicted.  "[S]o long as the witness can verify that the [video] accurately represents its subject," the witness need not have been present at the time the video was taken.  Wilson, 135 N.J. at 14.

Even if we were to assume this authenticating testimony was insufficient, defendant deprived the prosecution the opportunity to offer other evidence that would have sufficed by failing to object.  For example, Aaron and his aunt testified about the scene of the crime and the unfolding events.  Although they were not shown the surveillance video, they were shown and identified several

9

pictures of the neighborhood and the crime scene. Had defendant objected to the detective's authentication testimony or argued the testimony was insufficient, the prosecution could have provided whatever might have been missing by calling those other witnesses to testify. Moreover, the testimony of Aaron and his aunt, aided by photographs, provided further substantiation of the video's authenticity.

We also reject the contention that the detective improperly narrated the video footage. His testimony did not reach beyond what was provided by other evidence, adduced from witnesses with personal knowledge, or beyond what anyone else might observe while viewing the footage; for example:

> Q: And are they out of the frame?
>
> A: Yes, they are.
>
> Q: Are [their] shadows still there?
>
> A: Their shadow is still there. This would be Eric Freeman's right here and this would [be] Aaron Bray's. Now, both their shadows have been removed from camera angle. Coming into picture is two individuals; one wearing dark clothing and then a second individual wearing a gray hoody.
>
> The individual with the gray hoody is going to stay at the intersection while the individual with the black jacket is going, crossed through the intersection. He is now proceeding south on Sylvan Way in the direction of Aaron Bray and Eric Freeman.

Q: This portion of the footage, could you determine any characteristics of the person in the black jacket's hairstyle?

A: Yes. It appears that his hair is pulled back into either like a ponytail or a bun.

The detective then described, while the video was playing, the movements of the man wearing the black jacket and the man wearing the gray hooded sweatshirt, but he did not opine or suggest their identity. He also did not comment on the shooting itself, which was not captured on the video. And it bears repeating that at no point during the detective's testimony did defendant object.

We find no error in the admission of the detective's testimony about what was depicted in the video. Although he did not observe the events as they unfolded, his testimony about the video was permissible because he did not purport to provide an eyewitness account of the shooting. Rather, his testimony was relevant to aid the jury in its understanding of what was depicted, as to which he was familiar from his investigation of the area. See People v. Brown, 82 N.E.3d 148, 167 (Ill. App. Ct. 2017) (finding detective's narration appropriate, even though he was not present at the live event, because he was not providing an eyewitness account, but was describing the scenes shown in

11

the recording); <u>People v. Hardy</u>, 981 N.Y.S.2d 722, 723 (N.Y. App. Div. 2014) (recognizing that "[e]ven when the witnesses described events depicted on the videotapes that they had not observed, they were still generally testifying about matters within their knowledge, and nothing in their testimony deprived defendant of a fair trial").

In his brief, defendant categorizes the detective's testimony as "lay opinion testimony"; we disagree. The detective did not opine about the identity of the unnamed individuals that appeared in the video, nor did he opine about how the shooting occurred.[2] He simply described what was visible onscreen, which was permissible because his testimony was based on his perceptions of the video and his familiarity with the area.

---

[2] Defendant heavily relies on <u>State v. Lazo</u>, 209 N.J. 9 (2012) in this regard. We are not persuaded. <u>Lazo</u> – which concerned a police officer's testimony about how and why he assembled a photo array, <u>id.</u> at 12 – was problematic because the officer had no personal knowledge of the crime committed yet he "told the jury that he believed [Lazo] closely resembled a composite sketch of the assailant and therefore included a photo of [Lazo] in the array." <u>Ibid.</u> The Court found that the officer's testimony should not have been admitted because "an officer's reasons for placing a particular photo in an array are irrelevant and prejudicial." <u>Id.</u> at 12-13. Defendant's comparison of <u>Lazo</u> with this situation is mistaken. Unlike the officer in <u>Lazo</u>, the detective made no attempt to identify defendant. He also did not speculate about the shooting. He only described what he saw onscreen, and because jurors were also shown the footage, there was no attempt to add more to an understanding of the video than what appeared onscreen.

12

We also reject defendant's contention that the detective's statements regarding "the shadow" that appears in the video were "nothing more than [the detective's] opinion," which served to "corroborate [Aaron's] testimony that the man in the black jacket had been the shooter, and that he had run from the scene immediately after the crime." But the testimony about the shadow was based on a perception of what the video revealed, which the jury was simultaneously able to view and judge for itself.

Defendant also argues introduction of the video "prejudiced" him because it did not show "the actual shooting and the presence of a firearm." The video's failure to capture the actual shooting, however, benefitted defendant, as he was free to argue that the very absence of that part of the incident suggested a reasonable doubt about what occurred. He also claims "the prosecution used [the detective's] testimony . . . to bolster Aaron Bray's credibility." But the detective never opined that Aaron was telling the truth; he simply pointed out where the video proved consistent with what Aaron had told him:

> Q:  . . . you described the individual with the gray hooded sweatshirt who was with the individual with the black jacket.  Correct?
>
> A:  Yes.
>
> Q:  And fair to say the person stays back.  Correct?

13

A:  That's correct.

Q:  Is it consistent with what [Aaron Bray] ultimately told you?

A:  Yes.

This testimony offers no commentary on Aaron's credibility.

Defendant lastly argues that he was prejudiced by the way in which the video was presented because "it basically allowed the prosecution to give a mid-trial summation of what it believed had occurred during the course of this incident."  But, again, the detective never opined about the shooting itself.  He did not say any depicted individual was defendant; he did not say that the individual in the footage was carrying a weapon; and he did not say that the individual wearing the black jacket shot Eric.  He never usurped the jury's fact-finding function in testifying about the video.  We find no error, let alone plain error.

## II

In his second and last point, defendant argues he was denied a fair trial because the judge failed "to instruct the jurors that they could draw a negative inference from the police officers' failure to record the first three oral statements of Aaron Bray."  This argument lacks merit.

14

At trial, the detective explained that he did not record his earlier discussion with Aaron at his girlfriend's house because Aaron was distraught and crying.  Later, at the police station, Aaron's statements weren't recorded for the same reason.  As the detective testified:

> Q:  Now, had his mindset or his demeanor, had it changed at all once you got to the office?
>
> A:  Not really.  Not really.  It's like he was still in shock is I guess a good word for it.  Asking him questions, it was very tough.  By no means did I not think he was holding back or is not trying to cooperate; it's just he had so much raw emotion going on at that time that – I mean crying profusely, really to the point it was at times hard to understand exactly what he was saying.
>
> He had just witnessed his best friend get killed in front of him.  And for other reasons.  And he just – he cooperated with us.  He, for lack of a better word, his head just was not straight.  But I got information from him that, A, I knew kind of who we were looking for, along with the fact of he was going to cooperate, which is the most important.

Following this interview, Aaron returned to his girlfriend's house.  The next day, officers contacted Aaron a second time.  He returned to the station where another interview was conducted, and then a formal statement recorded.  As the detective testified:

> Q:  At this point in time had his demeanor changed at all?

15

A: He was still obviously distraught, but he, for lack of a better phrase, had a clearer head that he could speak better, and it was obviously easier to take a formal statement from him at that point.

. . . .

Q: Now, did you interview [Aaron] about the incident prior to taking a formal statement?

A: Around noon, yes, we did.

Q: And what is the purpose of interviewing a person?

A: Well, in this case, A, you want to know exactly what he's talking about. But for me I wanted to see if his story was going to change at all from the night before. Not that I think he would lie or anything, I just wanted to see that, considering what he had just witnessed the day before, and now that him having a couple more hours to let it all soak in to see if anything changed, and nothing did.

In his statement, Aaron described the shooter, and identified defendant following the administration of a photographic lineup.

During cross-examination, defense counsel emphasized that the detective's first interactions with Aaron were not recorded "in any manner." But, defense counsel never requested an adverse inference instruction. Notwithstanding, he now argues an adverse inference charge was warranted. We reject this.

Defendant has not – and cannot – show that the police were required to record all their discussions with Aaron. The cases upon which defendant relies – State v. Cook, 179 N.J. 533 (2004), State v. W.B., 205 N.J. 588 (2011), and State v. Dabas, 215 N.J. 114 (2013) – do not so hold.

In Cook, the defendant was interrogated multiple times by investigators who did not electronically record the questioning and then destroyed their notes. 179 N.J. at 542-46. The Court noted its disapproval of this practice and established a "committee to study and make recommendations on the use of electronic recordation of custodial interrogations." Id. at 562. Later, the Court adopted Rule 3:17, which requires the electronic recordation of custodial interrogations in cases involving serious offenses.

The Court expanded on this in W.B., 205 N.J. at 608, holding that the State must preserve, for later disclosure, the pre-indictment writings and notes of a police officer under the prosecutor's supervision. The Court explained that once "a case is referred to the prosecutor following arrest by a police officer as the initial process, or on a complaint by a police officer, local law enforcement [becomes] part of the prosecutor's office for discovery purposes." Ibid. (citations omitted). Upon indictment, those notes are discoverable as reports "in the possession, custody and control of the prosecutor." Ibid. (citing R. 3:13-3).

The Court also held that, prospectively, if such notes "are lost or destroyed before trial, a defendant, upon request, may be entitled to an adverse inference charge molded, after conference with counsel, to the facts of the case." Id. at 608-09. As the defendant in W.B. neither requested an adverse inference charge, nor timely raised the issue before moving for a new trial, the Court declined to hold the charge was required. Id. at 609. And the Court noted that an adverse inference charge may be "unnecessary where enough evidence is presented to make [the] out-of-court statement trustworthy" without the notes. Id. at 609 n.10.

Unlike W.B., the Court found warranted an adverse inference charge in Dabas, 215 N.J. at 119, 123-24, where an investigator conducted an unrecorded pre-interview of the defendant, during which he took handwritten notes. The pre-interview was then followed by a recorded interrogation, which consisted of short answers to leading questions. Id. at 123-24. A year after the issuance of the indictment, the investigator destroyed his pre-interview notes upon preparation of his written report. Id. at 123. The Court held that the investigator's notes were discoverable material under Rule 3:13-3(c), and the prosecutor violated the rule by failing to retain the notes. Id. at 133-35. The Court also determined that the trial judge erred by denying a defense request for

an adverse inference charge, noting that "[b]alancing the scales" in such an instance required an adverse inference charge consisting of instructions that: (1) "the State had a duty to produce the pre-interview notes to the defense following the return of the indictment"; (2) "[b]ecause the State made the notes unavailable, . . . the jury . . . was permitted to draw an inference that the contents of the notes were unfavorable to the State"; and (3) "[w]hether to draw such an inference falls within the jury's discretion, after it gives full consideration to the nature of the discovery violation, the explanation given by the State for the violation, and any other relevant factors that would bear on the issue." Id. at 141.

Here, defendant did not object and his arguments must be assessed via the plain error standard of review. R. 2:10-2. See State v. Torres, 183 N.J. 554, 564 (2005). When a defendant does not object to a charge at the time it is given, "there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case." Singleton, 211 N.J. at 182 (citing State v. Macon, 57 N.J. 325, 333-34 (1971)). See also State v. Adams, 194 N.J. 186, 206-07 (2008).

The officers here were not required to record every conversation with Aaron because Aaron was not a suspect; he was witness. Rule 3:17 requires

19

electronic recordation of "all custodial interrogations" if the person is suspected of having committed one of the enumerated crimes contained in the Rule and is ultimately charged with one of those crimes. Law enforcement authorities, however, "need not record the interrogation if at the time 'the accused is not a suspect for the crime to which that statement relates.'" State v. Anthony, 443 N.J. Super. 553, 571 (App. Div.), certif. denied, 224 N.J. 529 (2016) (citing R. 3:17(b)(vi)).

In short, the recordation requirements that apply to suspects do not similarly apply to witnesses.[3] In W.B., the Court specifically acknowledged that "[o]ur criminal discovery rules do not currently require the recordation of all statements of witnesses obtained by law enforcement officers." 205 N.J. at 608. Our rules provide only for discovery of all statements whether signed or unsigned, of witnesses as well as police reports that are "in the possession, custody or control of the prosecutor." R. 3:13-3(b)(1)(E),(G),(H). "[A] prosecutor is not obligated to create tangible items of evidence; he is only required to turn over items 'within the possession, custody or control of the

---

[3] Police do have a duty, however, to record details of out-of-court identification procedures that result in positive identifications and non-identifications as well as near misses and hits. State v. Delgado, 188 N.J. 48, 58-64 (2006); R. 3:13-3(b)(1)(J).

prosecuting attorney.'"  <u>State v. Gordon</u>, 261 N.J. Super. 462, 465 (App. Div. 1993).  <u>Cook</u>, <u>W.B.</u>, and <u>Dabas</u> deal with the loss or destruction of existing evidence, and thus, are not applicable because there is no evidence to suggest the officers destroyed anything.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1018-16T1