RECORD IMPOUNDED

 NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R. 1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5356-13T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

LATIMAR BYRDSELL,

 Defendant-Appellant.
________________________________________________

 Argued June 6, 2017 – Decided December 1, 2017

 Before Judges Messano, Suter, and Grall.

 On appeal from Superior Court of New Jersey,
 Law Division, Cumberland County, Indictment
 No. 07-02-0162.

 Joshua D. Sanders, Assistant Deputy Public
 Defender, argued the cause for appellant
 (Joseph E. Krakora, Public Defender,
 attorney; Al Glimis, Assistant Deputy Public
 Defender, of counsel and on the brief).

 Jane C. Schuster, Deputy Attorney General,
 argued the cause for respondent (Christopher
 S. Porrino, Attorney General, attorney; Ms.
 Schuster, of counsel and on the brief).

PER CURIAM
 Defendant Latimar Byrdsell was convicted of crimes

committed on July 10, 2006, against his fiancée's daughter, who

was three years old. He challenges the denial of his motion to

suppress statements he made to investigating officers the next

day, the jury instruction on consideration of the unrecorded

portions of his custodial interrogation and his sentence.1

Defendant did not testify or present evidence at the suppression

hearing or trial.

 The jury found defendant guilty of aggravated manslaughter,

N.J.S.A. 2C:11-4(a),2 felony murder in the commission of sexual

assault, N.J.S.A. 2C:11-3(a)(3) (count two); and first-degree

aggravated sexual assault, N.J.S.A. 2C:14-2(a) (count three).3

1
 Four judges of the Superior Court were involved in this case.
A hearing on defendant's motion to suppress commenced on April
11, 2011. On May 3, 2011, the suppression hearing was started
anew before a different judge. That judge took testimony and
listened to audio-recorded interviews on May 3, 4, 5 and 17,
2011, and that judge issued a written opinion dated November 4,
2011. A third judge presided over defendant's jury trial, which
commenced on April 24, 2013, and a fourth judge sentenced
defendant on November 15, 2013.
2
 In count one, the grand jury charged murder, N.J.S.A. 2C:11-
3(a)(1)-(2), and the judge submitted aggravated manslaughter to
the jury as a lesser included offense.
3
 The jurors did not consider counts four or five, charging
second-degree sexual assaults as defined in N.J.S.A. 2C:14-2(b)
and (c). Count five was dismissed at trial, and the verdict
sheet directed the jurors not to consider count four if they
found defendant guilty of first-degree sexual assault.

 2 A-5356-13T1
 The court merged defendant's convictions for felony murder

and first-degree sexual assault but not his convictions for

felony murder and aggravated manslaughter. As mandated by

N.J.S.A. 2C:11-3(b)(3) for felony murder involving sexual

assault involving a child less than fourteen years old, the

court sentenced defendant to life imprisonment without parole.

For aggravated manslaughter, the court imposed a concurrent

twenty-seven years' imprisonment subject to periods of parole

ineligibility and supervision required by the N.J.S.A. 2C:43-

7.2. The court also ordered restitution and imposed monetary

sanctions and assessments for the homicides and the sexual

assault.

 I.

 When the crimes were committed, defendant, his fiancée, and

her child were living, as they had been for several months, in a

motel-apartment in Millville. On July 10, the child was alone

in defendant's care from about 1:45 p.m., when her mother left

for work, until the EMTs arrived in response to 911 calls

defendant placed at 9:38 and 9:43 p.m. The child's mother had

directed defendant to call 911, because she had called him from

work and he told her the child was gasping for air.

 The child's pulse was weak when the EMTs got to the

apartment and became undetectable during the trip to the

 3 A-5356-13T1
hospital. Despite the efforts of EMTs, the paramedics who

joined them en route to the emergency room (ER), and ER staff,

the child's heartbeat was not restored. She was pronounced dead

at 10:38 on July 10. The ER-doctor examined the child's body

for trauma and saw injuries to her vaginal and anal areas.

Consequently, law enforcement was notified.

 The next afternoon Detectives O'Neill and Roman of the

Cumberland County Prosecutor's Office (CCPO) interviewed the

child's mother at her mother's home. Defendant arrived while

they were there, and he agreed to accompany the detectives to

the police station in Millville and give a statement.

 Defendant's interview commenced at 4:00 p.m., and from 4:00

until 8:58, which is when defendant asked a detective to "cut"

the recording device "off for a second," his interviews were

recorded.4 After that, there were no recordings. Defendant's

interview ended at 11:53, which is when he signed a statement

the detectives had composed and typed. The statement he signed

is the detectives' typed summary of defendant's statements: "I

was asked to voluntarily give a taped statement or written

4
 There were pauses in the recording to change its memory card
and other pauses where one or both officers left the interview
room. At the hearing on defendant's motion to suppress, the
defense stipulated that nothing of import occurred during those
breaks.

 4 A-5356-13T1
statement regarding my involvement in this investigation, but I

refused after having been advised that I'm not obligated to give

a taped or written statement." Because the recording had not

been re-activated when the statement was prepared, neither

defendant's refusal to give a recorded statement nor the

admissions it includes were recorded.

 The statement, which was read to defendant before he signed

it and to the jury at trial, includes these admissions.

Defendant started drinking brandy between 3:00 and 4:00 in the

afternoon on July 10. He had purchased the brandy the day

before and hidden it in a pocket of pants in their hamper,

because his fiancée thought he acted crazy when drinking.

Around 8:30, the child acted up, and he told her to be quiet.

Upset by her crying, he let the alcohol take over. He picked

the child up from her bed, laid her on the other bed on her

stomach and put a pillow over her head. When she moved and

tried to take the pillow off, he pushed it down. After she was

quiet, he removed the pillow and noticed she was not breathing

normally. The injuries to the child's vagina and anus "were

caused" when he had her head covered, but he did not put

anything inside her or touch her vagina or anus. No one else

had come into their apartment that day. Defendant was sorry,

did not mean to do it and would take it back if he could.

 5 A-5356-13T1
 Following an autopsy, the medical examiner (M.E.) concluded

the child died as a consequence of asphyxia due to smothering.

The M.E. found internal and external bruising of the child's

neck and back. Among other injuries, the M.E. found a one-half

inch long rectal tear caused by a "forceful stretching," an

abraded bruise inside the child's labia minora, and, a hymen

that was not intact, "very red" and had a "scrape." The M.E.

concluded those injuries were sustained no earlier than twenty-

four hours before the child's death.

 Although the child had been with relatives the day before

she died, she, her mother and defendant returned to their

apartment together at about 11:00 p.m. that night. That was

about twenty-three hours and thirty-eight minutes before she was

pronounced dead. During the early part of his interview,

defendant agreed to provide and provided a DNA sample, but the

results disclosed nothing significant. There were no witnesses

to the crime.

 Defendant raises these issues on appeal:

 POINT I

 THE POLICE VIOLATED DEFENDANT'S FIFTH
 AMENDMENT AND STATE COMMON LAW RIGHT TO
 COUNSEL BY QUESTIONING HIM AFTER HE INVOKED
 HIS RIGHT TO COUNSEL. SINCE DEFENDANT'S
 RIGHTS WERE NOT SCRUPULOUSLY HONORED, HIS
 SUBSEQUENT STATEMENTS AT VINELAND POLICE

 6 A-5356-13T1
HEADQUARTERS MUST BE SUPPRESSED. (U.S. CONST.
AMENDS. V; XIV; N.J. CONST. ART. I, ¶ 1).

POINT II

BECAUSE BYRDSELL'S ORAL AND WRITTEN STATEMENTS
AT THE VINELAND POLICE DEPARTMENT WERE NOT
KNOWINGLY, INTELLIGENTLY, AND VOLUNTARILY
MADE, AND BECAUSE THREE HOURS OF BYRDSELL'S
INTERROGATION AT VINELAND POLICE HEADQUARTERS
WAS UNRECORDED BY THE POLICE, CONTRARY TO R.
3:17, THE TRIAL COURT'S REFUSAL TO GRANT HIS
MOTION TO SUPPRESS THOSE STATEMENTS DEPRIVED
HIM OF DUE PROCESS OF LAW AND VIOLATED HIS
PRIVILEGE AGAINST SELF-INCRIMINATION. (U.S.
CONST., AMEND V, XIV; N.J. CONST. (1947) ART.
I, PAR. 1).

 A. VOLUNTARINESS.

 B. FAILURE TO RECORD STATEMENT
 PURSUANT TO R. 3:17.

POINT III

A CRITICAL SECTION OF [THE] COURT'S CHARGE ON
THE FAILURE OF THE POLICE TO RECORD
DEFENDANT'S STATEMENT, THAT PORTION WHICH
INFORMED THE JURY OF THE EVIDENCE IN THE CASE
THAT IT COULD CONSIDER IN DECIDING WHETHER
BYRDSELL'S STATEMENTS WERE CREDIBLE, WAS
OMITTED. (NOT RAISED BELOW)

POINT IV

IN THE ALTERNATIVE, THE CASE SHOULD BE
REMANDED FOR RESENTENCING BECAUSE THE
SENTENCING JUDGE WRONGLY FOUND SEVERAL
AGGRAVATING FACTORS AND FAILED TO FIND AS
MITIGATING FACTORS THE FACT THAT BYRDSELL HAS
NO PRIOR CRIMINAL RECORD AND THE FACT THAT HE
HAS SUBSTANTIAL COGNITIVE IMPAIRMENTS.

 7 A-5356-13T1
 II.

 Defendant's challenges to his convictions all concern the

admission of statements he made to officers investigating the

crimes. Review of such rulings is narrow. Where factual

findings are "supported by sufficient credible evidence in the

record" deference is required. State v. S.S., 229 N.J. 360, 374

(2017) (quoting State v. Gamble, 218 N.J. 412, 424 (2014)); see

id. at 381. "Corrective action" is appropriate only "when

factual findings are so clearly mistaken — so wide of the mark —

that the interests of justice demand intervention." Id. at 381.

Only review of legal issues is de novo. Id. at 380.

 A.

 Defendant claims he invoked the right to counsel "for a

limited purpose (the polygraph exam)" and detectives failed to

scrupulously honor his invocation.5 This argument rests on a

segment of the interview that was recorded.

5
 The brief submitted on defendant's behalf states:
 Because Mr. Byrdsell requested counsel for a
 limited purpose (the polygraph exam), the
 police could continue to question him at the
 Millville Police headquarters without having
 counsel present. See Connecticut v.
 Barrett, 479 U.S. 523 (1987) (where
 defendant told the officer that he would not
 give a written statement unless his lawyer
 was present, but had no problem talking
 (footnote continued next page)

 8 A-5356-13T1
 When defendant's interview with Detectives O'Neill and

Roman commenced at 4:00 p.m., O'Neill posed preliminary

questions. Defendant was twenty-three years old and a high

school graduate, could read and write the English language and

had never been arrested or convicted of a crime. O'Neill then

delivered Miranda6 warnings. Defendant does not challenge the

clarity or adequacy of the warnings or the validity of his

waiver of his Miranda rights, which the judge found the State

established beyond a reasonable doubt. State v. Adams, 127 N.J.

438, 447 (1992). Accordingly, there is no reason to address the

warnings.

 After defendant signed the waiver of his Miranda rights,

O'Neill questioned defendant about his living arrangements, his

relationship with the child, and the events of July 10 and the

previous day; Roman primarily observed. Defendant initially

told the detectives he had been alone with the child from the

time her mother went to work. O'Neill told defendant the M.E.

(footnote continued)
 about the offense, this was only a limited
 request for counsel, and the police could
 continue to question him).

 [emphasis added].
6
 Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d
694 (1966).

 9 A-5356-13T1
had found damage to the child's vagina and anal areas, and he

and Detective Roman had to determine how they were caused.

Defendant answered O'Neill's questions, and at 5:12 p.m., he

agreed to give and provided a sample of his DNA.7

 O'Neill had to pause the recording device to change the

disc at 5:27. At that point, he and defendant had been

discussing the case for nearly an hour and one-half. Five

minutes later, the interview resumed.8

 The first question O'Neill posed when the recording was

resumed at 5:32 was whether the detectives and he had talked

about the case while the tape was off. Defendant said, "I asked

you one question." O'Neill asked him to repeat it, and

defendant did: "Alright, what can I do to clear my name out of

this because I didn't do anything."

 O'Neill asked defendant to speak a little louder. Instead

of repeating his question, defendant commenced the colloquy he

claims was his invocation of the right to counsel.

 [Defendant]: I'll take a lie detector test
 to clear my name because I didn't do any
 such thing.

 [Detective]: So you want to take a lie
 detector test?

7
 The DNA testing did not yield any significant information.
8
 See footnote 4 above.

 10 A-5356-13T1
 [Defendant]: If that's what it comes down
 to, like for that part I will request a
 lawyer because now I feel like I'm being
 accused of something that I didn't do.

 [Detective]: Okay. Well, uh . . . .

 [Defendant]: I tell you everything I know,
 everything I know, I told you. I have not
 told you no lie. I'm not going to tell you
 no lie. And now I feel as though like
 (indisc.) like thinking I'm the suspect when
 I didn't do anything wrong. I'm saying,
 tell you from the bottom of my heart, I
 never lied to you since we begin this
 interview, I never lie to you. I'm not
 going to start now but you, you all is
 looking at me like I'm the one doing all
 this and I'm not. I'm telling you, I'm not.
 I never done (indisc.), that's not me. I
 don't do things like that. I don't get no
 satisfaction out of that. There's nothing
 for me there. I don't do that. It never
 crossed my mind. It never will. And it
 hurt to be in a situation like this knowing
 that I didn't do no such thing. I can tell
 you and I can tell anybody that and I will
 keep saying it, keep saying it because I did
 not do it.

 [Detective]: Okay.

 At the suppression hearing, defense counsel asked O'Neill

whether he responded by asking "do you want a lawyer present?"

The detective, who had not asked that question, responded:

 Let me make it clear to you. [Defendant]
 said that he would be willing to take a lie
 detector test, which I wasn't expecting him
 to say it because it wasn't even part of the
 conversation. He said he felt like he was
 being accused now, but for that part of it
 he will request an attorney, referring to

 11 A-5356-13T1
 the polygraph test, if it was available to
 him. That was clearly my understanding.

 Defense counsel then asked O'Neill whether he agreed that

accusations of sexual assault against a child would be

distressing and lead someone to ask for an attorney about

speaking to the police. O'Neill responded: "But, that wasn't

the case in this particular investigation. He didn't ask to

speak to an attorney regarding speaking with me. He was

referring to the polygraph test."

 The judge found defendant had not invoked his right to

counsel. He explained, defendant

 indicated that for the upcoming polygraph
 examination, he would request a lawyer,
 stating "for that part (the polygraph
 examination) I will request a lawyer." . . .
 [Defendant's] statement here is nothing more
 than an indication that the defendant
 reserved his right to request an attorney at
 some future point in time.

 [emphasis in original.]

 That finding is "supported by sufficient credible evidence

in the record" and deference is required. S.S., supra, 229 N.J.

at 374, 381. After the recorder was reactivated, defendant said

he had asked O'Neill how he could clear his name, and when asked

to repeat the question he asked, gave his own answer: "I'll take

a lie detector test to clear my name because I didn't do any

such thing." Viewed in that context, his stated intention "I

 12 A-5356-13T1
will request a lawyer" if "it comes down to" a polygraph,

suggests his confidence that he would be able to convince the

detectives by talking to them. Defendant demonstrated that by

launching into the monologue professing his truthfulness,

sincerity and disdain for sexual abuse of children, which he did

without waiting for O'Neill to complete what he was saying.

 Defendant's reliance on Connecticut v. Barrett, 479 U.S.

523, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987), is misplaced. In

Barrett, the Court determined that "defendant's refusal to give

a written statement without his attorney present was a clear

request for the assistance of counsel to protect his rights in

his dealings with the police," for that limited purpose. Id. at

527, 107 S. Ct. at 831, 93 L. Ed. 2d at 926. The difference

between this case and Barrett is that defendant did not say he

would not take a polygraph without a lawyer present. He said, I

"will request" an attorney if it comes to that.

 The New Jersey Supreme Court's decision in State v. Gerald,

113 N.J. 40 (1988), highlights that statements like defendant's

require a two-step analysis. In Gerald, the Court was

confronted with what it termed an "alleged invocation of the

right to counsel." Id. at 114. The defendant had confessed to

the police chief and was then "asked to make a taped statement."

Ibid. "Defendant replied that he was willing to answer the

 13 A-5356-13T1
officers' questions but that he wanted to consult with counsel

before making a taped statement." Id. at 114-15. "The officers

then offered to cease questioning, but the defendant indicated

that he would feel better if he talked about the incident." Id.

at 115. The Court concluded Gerald's statement raised "two

possible issues: first, [the threshold question] whether

defendant's statement constituted an assertion of the right to

counsel, and if so, whether the police properly honored that

assertion." Ibid. The Court concluded: Gerald's "statement was

equivocal at best. His indication that he would answer all

questions, but would not make a taped statement unless he had

seen a lawyer, was unclear regarding his invocation of his right

to counsel." Id. at 116 (emphasis added).

 In this case, the defendant did not say he would not take a

polygraph without counsel. He said if it comes down to a

polygraph, "I will request a lawyer." In short, there was no

equivocation or ambiguity. As the trial court aptly put it, his

statement was "nothing more than an indication that the

defendant reserved his right to request an attorney at some

future point in time." (emphasis in original). Stated

differently, the statement was the equivalent of an

acknowledgment of his right to request counsel at any time.

 14 A-5356-13T1
 In State v. Alston, 204 N.J. 614, 624 (2011), the Court

directed that when a suspect's "statements are so ambiguous that

they cannot be understood to be the assertion of a right,

clarification is not only permitted but needed." As there was

no ambiguity or equivocation here, that rule had no application.

 The judge properly resolved the threshold question

identified in Gerald — whether defendant invoked the right to

counsel — in the negative. For that reason, defendant's claim

that officers failed to scrupulously honor his invocation of the

right necessarily fails.

 We address the events that followed defendant's first

reference to counsel, because Detectives O'Neill and Roman did

eventually bring defendant from the Millville to the Vineland

police station so that Detective Negron, of the Vineland Police

Department, could administer a polygraph. Defendant made all of

his unrecorded and his most incriminating statements during

subsequent interrogations conducted by Negron and O'Neill at the

Vineland station.

 When defendant first mentioned the polygraph to O'Neill and

Roman, the detectives did not know if there was a qualified

officer available to administer one. Minutes after defendant

mentioned the polygraph, at 5:36, O'Neill and Roman left the

 15 A-5356-13T1
interview room. At 5:45, O'Neill returned with his superior

Sergeant Chopek.

 Chopek told defendant he had just spoken to the M.E., and

he gave defendant an account of what he knew about the case.

Defendant asked Chopek if he could ask Chopek a question, and

Chopek said, "Sure." Defendant asked, "What can I do [sic] able

to prove that I did no such thing?" In response, Chopek

mentioned that the DNA defendant had provided could help, but

not necessarily, and that another thing would be a polygraph,

which could be helpful or harmful depending upon whether it

showed deception. Defendant said, "Okay."

 Chopek responded by reminding defendant of his prior

mention of counsel for a polygraph, thereby presenting defendant

with an opportunity to make the request he said he would make if

it came to that. The colloquy was brief:

 [Chopek]: Okay, but I understand earlier
 you told the detective that if you were, if,
 uh, you'd be willing to take a polygraph
 . . . if you were to take a polygraph, you'd
 want an attorney for that.

 [Defendant]: I'm trying to do anything to
 prove my innocence because I did not do
 anything. Whatever it takes to prove my
 innocence. Because I have not done anything
 but care for that child like (indisc.).

 After that exchange, defendant continued to deny any

inappropriate touching of the child and asked twice if he could

 16 A-5356-13T1
go and see his family. O'Neill told defendant they needed a few

minutes to discuss it, and then Chopek expressed appreciation

for his cooperation. Defendant asked again to go see his

family. Chopek asked, "When we're done here?" Defendant said

"Yeah," and then Chopek said, "Hell, yeah." Defendant said, "I

just want to be with my fiancée this time like this." The

officers left him at 5:56.

 After that there was a significant break. At 6:01, O'Neill

returned and offered defendant something to drink, a bottle of

water, pizza or anything. Defendant said "I just want to see my

family, that's all." O'Neill and defendant each assured the

other he was doing the best he could. Defendant declined a

second offer of food and said, "I just want this to all be over

with." He declined another offer of something to eat or drink,

and O'Neill left the room at 6:02.

 At 6:23, O'Neill returned to let defendant know he was

still waiting for a phone call. Defendant declined another

offer of food or beverage, and he restated his desire to see his

family. At 6:46, defendant asked O'Neill when he could go to

see his family, and O'Neill said he was still waiting for a

call. Defendant asked if O'Neill was waiting for the buccal

swab results. O'Neill said, "a couple of them" and told

 17 A-5356-13T1
defendant he would be able to tell him what was "going on and

then we go right from there."

 Three minutes later, O'Neill told defendant they could

offer him a polygraph if he wanted one and if he chose to do

that. O'Neill then knew Detective Negron could do a polygraph.

O'Neill told defendant he could go home if he passed but if it

came out that he was being deceptive they would have to sit down

and talk.

 At 6:50, O'Neill left the room again. When he returned at

7:00, he told defendant they were going to give him the

opportunity to take the polygraph. He asked if defendant had

any questions, and defendant said: "Let's get it over with."

 O'Neill introduced Negron to defendant at 7:37 in an

interview room at the Vineland station. Negron started by

telling defendant he wanted to advise him of his rights.

Defendant again acknowledged his understanding and waived his

rights. This colloquy on the right to counsel followed:

 [Detective]: Do you still, uh, want to
 proceed to speak with me?

 [Defendant]: It's okay by me.

 [Detective]: Huh?

 [Defendant]: Yes, to prove my innocence,
 yes.

 18 A-5356-13T1
[Detective]: Okay. Now, uh, you have the
right to proceed our conversation with the
tape recorder on or you can have it shut it
off. What do you, how do you, how do you
want to continue this?

[Defendant]: (Indisc.) (Indisc.) make a
difference to me because I don't got nothing
to hide.

[Detective]: Okay. No problem. I need you
to put your initials here and sign your
name.

[Defendant]: Think a lawyer necessary?

[Detective]: That is up to you. That's,
it, it says here you have the right to have
an attorney present if you so desire. You
understand that right?

[Defendant]: Yeah, I understand.

[Detective]: Do you want an attorney?

[Defendant]: What's an attorney going to
do?

[Detective]: Well, I want you to understand
something. Okay, this is a, uh, an
investigation which is being handled by the
Prosecutor's Office here. You've come into
this, the Vineland Police Department because
you volunteered to take a polygraph. Okay.
Before I give you the polygraph, I have to
advise you of your rights. I want you to be
aware of your rights. Okay? If you, you
mentioned that . . . you said, if I feel, if
a lawyer's necessary, that is a decision
that you must make yourself. I can't make
that decision for you. I advised you of
your rights. Your [r]ights says that you
have the right to consult with an attorney
at any time, okay, and have him present
before and during questions. That's one of

 19 A-5356-13T1
 your rights. If you, if you wish to proceed
 without an attorney, let me know. If you
 don’t want to proceed and you want to
 contact an attorney, that's . . . .

 [Defendant]: I just want this over with. I
 just want to prove my innocence.

 [Detective]: But I'm just saying, what do
 you want to do?

 [Defendant]: Just give me the test.

 [Detective]: You want to proceed without an
 attorney?

 [Defendant]: Yes. Let's get it over with.

 [Detective]: Is that "yes"?

 [Defendant]: Yes.

 The judge addressed defendant's interactions with Chopek

and Negron set forth above in his written decision.

 Later on in the interrogation here, when an
 officer [Chopek] referred to [defendant's]
 earlier statement that he wanted a lawyer
 for the polygraph, [defendant] reiterated
 his desire to prove his innocence. Finally,
 shortly before the [intended] administration
 of the polygraph, [defendant] again received
 Miranda warnings, and asked what a lawyer
 would do for him. Upon clarification by
 police, [defendant] repeatedly indicated his
 desire to proceed . . . . Here, as required
 by Alston, the police clarified the
 defendant's arguably ambiguous request for
 counsel; in response, defendant indicated
 that he wished to proceed without counsel.
 Although [defendant] asked if needed a
 lawyer when he was read his Miranda rights,
 this is not an ambiguous request for counsel
 under Alston, but merely a request for

 20 A-5356-13T1
 advice from a police officer [on] a known
 right.

 [See Alston, supra, 204 N.J. at 624.]

 Those findings are supported by sufficient credible and

undisputed evidence and entitled to deference. Substantially

for the reasons the judge stated in his written opinion, as

supplemented above, we reject defendant's first claim.

 Because defendant had not invoked his right to counsel for

a polygraph, the rule established in Edwards v. Arizona, 451

U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh'g denied, 452

U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981), that would

require cessation of all questions about a polygraph if

defendant had invoked his right to counsel for that limited

purpose, did not apply. For the same reason, this court's

decision in State v. Shelton, 344 N.J. Super. 505 (App. Div.

(2001), is inapplicable. In that case, we found error in the

denial of a suppression motion because the defendant invoked his

right to counsel for the limited purpose of making a written

statement and the officers' attempts to convince him to put his

oral admissions in writing violated their obligation to honor

his invocation.

 Chopek, by reminding defendant of his statement of future

intention to request counsel, and Negron, by re-administering

 21 A-5356-13T1
Miranda warnings, were presenting defendant with opportunities

to act upon his previously stated future intention.

 B.

 Defendant's remaining challenges to his convictions involve

the question whether his admissions were knowingly,

intelligently and voluntarily made, especially those that were

not recorded. "[T]he voluntariness of a confession [must] be

demonstrated beyond a reasonable doubt." State v. Cook, 179

N.J. 533, 552 (2004). In State v. Cook, the Supreme Court

initiated the process of developing a court rule addressing

recordation of custodial interrogations. Id. at 562; see State

v. Anthony, 443 N.J. Super. 553 (App. Div.) (discussing the

development and application of Rule 3:17 pursuant to Cook),

certif. denied, 224 N.J. 529 (2016).

 Rule 3:17, which requires electronic recordation of

custodial interrogations of persons suspected of designated

crimes, had been in effect with respect to homicide

investigations for a little over six months when defendant was

interviewed on July 11, 2006. Anthony, supra, 443 N.J. Super.

at 566. Where the Rule requires recording, a failure to record

has two implications. It is a factor for consideration by the

judge, "in determining the admissibility of a statement," and

for consideration by the jury, "in determining whether the

 22 A-5356-13T1
statement was made, and if so, what weight, if any, to give to

the statement." R. 3:17(d).

 A violation of the Rule "does not require suppression of a

defendant's statement." Anthony, supra, 443 N.J. Super. at 566.

In that respect, the Rule follows prior law holding "that

whether a statement is memorialized or not is but a factor

contributing to the overall determination of a statement's

voluntariness." Cook, supra, 179 N.J. at 552. Rule 3:17 makes

it clear that the Court must consider that factor where there is

a violation.

 In this case, the judge who decided the suppression motion

fully considered and properly applied Rule 3:17. He found a

violation of the recording requirement and weighed that

violation in determining whether defendant's statements were

knowingly, intelligently and voluntarily made and cited

paragraph (d) of Rule 3:17. The judge assigned "limited" weight

to that factor "because the only evidence before the court [with

respect to unrecorded statements] was the testimony of the

police, which [the judge] found credible." Given the deference

this court owes to credibility findings of a judge who had the

opportunity to hear and observe the testimony, we have no basis

for substituting our assessment of the weight assigned.

 23 A-5356-13T1
 Defendant also argues that "the findings of the trial court

are not supported by sufficient credible evidence in the

record," because the trial court's findings did not acknowledge

the substantial evidence in the record that "[defendant's]

statements at the Vineland Police Headquarters were not

voluntarily made, that [defendant's] will was overborne."

 Defendant points to the length of the interrogation; his

mental exhaustion; his crying; his multiple references to

wanting to see and be with his family; the officer's use of

psychological coercion; Detective Negron's appeals to

defendant's Christian beliefs; the officers' misrepresentations

regarding the time the child sustained the injuries (a reference

to the officers' misstating the M.E.'s window for child's

injuries as twenty-four hours within the interview rather than

the child's death; and the officers' reference to another

suspect who avoided the death penalty because of cooperation.

 The judge addressed each of those matters in his decision.

He found: the defendant was going through an "emotionally

upsetting experience" and "likely fatigued"9; the "untruthful

9
 Because the portions of the interview that were recorded were
audio-recordings, not video-recordings, we take the court's
references to defendant's appearance, body movements and facial
expressions as based on the testimony of the detectives at the
suppression hearing, which the judge credited.

 24 A-5356-13T1
representations" as to the time of injuries were insufficient to

overcome his will; the reference to the death penalty case was

neither a threat nor a promise but "an example of what happened

in other cases"; and that the appeal to defendant's religious

beliefs was one way to appeal to defendant's conscience and

sense of morality and right and wrong, and it was not enough to

overcome defendant's will.

 In this case, "the trial court's decision was a close

call," but it is supported by the testimony of the officers the

judge found credible, not "clearly mistaken and therefore

entitled to deference." S.S., supra, 229 N.J. at 374.

 For all of the foregoing reasons, we reject defendant's

challenges to the denial of his suppression motion, and affirm

the denial.

 Defendant's objection to the jury instruction given as

required by Rule 3:17 has insufficient merit to require

discussion beyond the brief comments that follow. R. 2:11-

3(e)(2). Where a recording is required but not made, "the court

shall, upon request of the defendant, provide the jury with a

cautionary instruction." R. 3:17(e). In this case, the

instruction was given, and the instruction on the essential

principles guiding the jurors' consideration of the recordation-

violation, mirrored the Model Jury Charge (Criminal),

 25 A-5356-13T1
"Statements of Defendant (When Court finds Police Inexcusably

Failed to Electronically Record Statement)" (Approved 2005).

 For the first time on appeal, defendant objects to the

court's omission of a discussion of the trial evidence pertinent

to the circumstances, conditions and the officers' conduct and

methods during the interview. Because defendant did not raise

the objection at the time, review is for plain error.

 Plain error in a jury instruction is "legal impropriety in

the charge prejudicially affecting the substantial rights of the

defendant and sufficiently grievous to justify notice by the

reviewing court and to convince the court that of itself the

error possessed a clear capacity to bring about an unjust

result." State v. Hock, 54 N.J. 526, 538 (1969), cert. denied,

399 U.S. 930, 90 S. Ct. 2254, 26 L. Ed. 2d 797 (1970). The risk

must be "sufficient to raise a reasonable doubt as to whether

the error led the jury to a result it otherwise might not have

reached." State v. Taffaro, 195 N.J. 442, 454 (2008).

 The trial court conducted a charge conference on the

record, and neither of the two attorneys representing defendant

requested the court to include references to the evidence and

factors pertinent on this point. Moreover, one of defense

counsel's closing arguments focused on the circumstance that

attorney deemed important to the questions the jurors had to

 26 A-5356-13T1
consider under the model charge in evaluating the officers'

testimony reciting statements defendant made during the

unrecorded portion of the interrogation.

 After the court instructed the jury, the court asked

counsel if there were any objections. One of the two attorneys

representing defendant had an objection to the court's

instruction on an unrelated portion of the instruction.

Defendant's second attorney had no objection. When there is a

"failure to object" to a jury instruction at the time it is

given, it is "fair to infer . . . that in the context of the

trial the error was actually of no moment." State v. Macon, 57

N.J. 325, 333 (1971).

 We recognize the importance of guidance related to the

proofs presented at trial. Nevertheless, in the context of this

case involving a myriad of pertinent circumstances, defense

counsel's closing argument highlighting all of the circumstances

favorable to defendant; the silence of both defense attorneys on

this point at the charge conference and after the court's

delivery of the instruction; and the fact that paragraph (e) of

Rule 3:17 requires a cautionary instruction only "upon request

of the defendant," we have no reasonable doubt about whether

additional guidance on the pertinent evidence would have changed

the outcome. Even assuming the omission was error, that error

 27 A-5356-13T1
was, beyond a reasonable doubt, not one with capacity to change

the outcome and produce an unjust result.

 III.

 Defendant contends that the judge who sentenced him

"improperly found and weighed" aggravating and mitigating

factors. There is no reason to address the judge's

consideration of aggravating and mitigating factors.

 The sentence imposed for felony murder was statutorily

mandated. N.J.S.A. 2C:11-3(b)(3). Accordingly, the

identification and weighing of aggravating and mitigating

factors was immaterial to that sentence. Defendant should not

have received any sentence for aggravated manslaughter. His

"aggravated manslaughter conviction should have merged into the

felony murder as there cannot be two homicide convictions for

the death of one victim." State v. Pantusco, 330 N.J. Super.

424, 444-45 (App. Div. 2000). The sentence that was imposed

must be vacated. Finally, the judge properly merged defendant's

conviction for aggravated sexual assault with his conviction for

felony murder, and no sentence was imposed for that crime. In

sum, there is no reason to ponder the judge's exercise of

sentencing discretion.

 A remand is required to correct the judgment of conviction

to reflect merger of defendant's convictions for felony murder

 28 A-5356-13T1
and aggravated manslaughter. Ibid. In addition, the judgment

reflects a conviction for a crime that the jury did not

consider, sexual assault in violation of N.J.S.A. 2C:14-2. That

crime was charged in counts four and five. The jurors did not

return a verdict on count four, which charged a violation of

N.J.S.A. 2C:14-2(b), because the verdict sheet directed the

jurors not to consider that offense if they found defendant

guilty of first-degree sexual assault. The judgment and amended

judgment of conviction, which were entered, respectively, on

December 3 and 23 of 2013, erroneously reflect merger of a

conviction on count four and that error must be corrected.

Count five charged a crime in violation of, N.J.S.A. 2C:14-2(b),

and that count was dismissed at trial. We remand for amendment

of the judgment of conviction to merge defendant's homicide

convictions, vacate his sentence for aggravated manslaughter and

dismiss count four. The mergers will require a new sentencing

proceeding to address the fines, penalties and assessments

imposed in light of the convictions.

 Affirmed and remanded for amendment of the judgment of

conviction and resentencing in conformity with this opinion.

Jurisdiction is not retained.

 29 A-5356-13T1